May it please the court. Good morning. My name is Ray Sheets. I'm from Cedar Rapids, Iowa. I represent Mr. Ngombwa. I got involved in this case shortly after the jury trial was over. The trial counsel at that time was asked to file a motion for a new trial and he refused to do so. And that's when I was hired to represent Mr. Ngombwa. Now I want to first begin by talking about the issue for a motion for a new trial based upon trial counsel's ineffective assistance. In this case, Mr. Ngombwa was charged with immigration fraud. The essence of the allegations against Mr. Ngombwa were that he falsely stated in his naturalization application several things regarding his family, several things regarding his membership in political party in Rwanda. And the trial counsel for Mr. Ngombwa at a very early stage in the proceedings asked for additional counsel to assist him. That motion, because he stated that he was not competent or not qualified to represent Mr. Ngombwa on his own, that motion was denied by the magistrate. When the trial counsel received that motion or that denial, he filed objections to the order. And among his objections were the magistrate found that trial counsel was a competent and qualified attorney and that magistrate thought he could do a good job representing Mr. Ngombwa. At document 35 in the record, trial counsel objected to the finding that he was a competent attorney in regards to this kind of case. His request for additional counsel was denied. And so he went on to represent Mr. Ngombwa. In his representation of Mr. Ngombwa, he went to Europe to interview witnesses. He went to Africa to interview witnesses, to several countries and witnesses. He hired an investigator to accompany him when he was interviewing the witnesses in Africa. At the hearing on the motion for a new trial, he disclosed that his office, the Federal Defender's Office in Des Moines, paid the investigator approximately $100,000 to accompany Mr. Burns. And the important thing about that is right in Mr. Burns' own backyard, literally, are the children of Mr. Ngombwa who had direct knowledge of every single of the allegations against Mr. Ngombwa. Yet, trial counsel chose not to interview his children. His children are now all adults. Two of them have a very, very clear memory as to what happened in Rwanda. All of them know the family situation of Mr. Ngombwa. But Mr. Burns or trial counsel never interviewed them. So in this case, the defense has to show two things in regards to this motion for a new trial. The first is counsel's performance was deficient. The Eighth Circuit has held that strategic decisions by trial counsel are almost unquestioned. But that same presumption does not follow when trial counsel fails to investigate the case. Quote, strategic choices made due to a lack of investigation are not protected by the presumption that counsel's performance was reasonable. So in this case, we have trial counsel's failure to investigate and to interview the most pertinent witnesses. Counsel, do we really have a failure to investigate here? Or was it a strategic decision not to interview the children because they felt that there could be damaging information revealed by those interviews? My response to that is an attorney has the obligation to interview all witnesses that have important information about the case. The damaging evidence that the children had was in regards to something that the government already knew at the time of trial. Just because you may or may not think that, which was that the two oldest children were not the biological children of Mr. Nagumba. They were in fact his nephews that he had taken in when they were quite young. And so instead of, they had come with Mr. Nagumba and his family to the refugee camps. And he told, Mr. Nagumba told the United Nations caseworker that they were indeed his children, which according to the custom of the Rwandans was true. So because trial counsel believed that the children had one piece of evidence that he believed was damaging. He didn't know anything, all the other parts, all the other key pieces of evidence that were very, very favorable. And the reason that is so important that he failed to investigate and failed to interview the witnesses is because there is not that same presumption of reasonableness that exists. When an attorney does interview witnesses and then decides, well, I won't call this witness because of that damaging information. We don't even get to that far. We don't get to that point. And if I included in my addendum the elements of the conspiracy, the overt acts of the conspiracy, and most of the falsehoods alleged by the government, the children had direct knowledge of that. For example. When did, to digress a moment, when did, you said the government already had this information about the relationship of the alleged children. When did the government obtain that information?  Given that, doesn't that lend some credence to this view that it was a tactical or strategic decision by counsel and that there could have been some risk in going forward? Sure. There's risk when you put on any witness that they may have positive, favorable information. They may have negative information. And the negative information that he thought they had was that the nephews, which had been raised by the DeGumbo family since they were small children, that's small potatoes compared to the large picture. So when you look at the interrogatories that the jury completed for their verdict, most of the overt acts that they found were directly related to information that the children knew. For example, the jury found that the two oldest children, who would have been 18 and 16 at the time of their resettlement in the United States, the jury found that they were interviewed by immigration and that they were falsely stated that, or that they stated that their uncle was a Rwandan politician. If the trial counsel would have spoke to them prior to trial, he would have learned that they were never interviewed by anyone while they were in the refugee camps. And because they were never interviewed by anyone, they certainly didn't make any false statements. That was set forth in the interrogatories, which the jury found because there was no evidence to the contrary. The children were willing to testify. The evidence shows that they were at the courthouse wanting to testify, but they were never called as witnesses. The only witness that was called, or there were two, by trial counsel was the defendant and trial counsel's secretary. Now, trial counsel made some direct examinations of a few of the government witnesses during the government's case in chief, but the effect that that had was negligible. So, the motion for a new trial is critical to this case. Other things that occurred. The second thing that we have to show is that the trial counsel's deficient performance prejudiced the defendants, but for the counsel's unprofessional errors, the result would have been different. Well, one can simply look at the verdict form, the interrogatory, in which the jury was asked to find the overt acts that Mr. Nagumo participated in. And you can see that most of those dealt with family relationships or what had happened in the refugee camps. And the final, and I'll move on to the sentencing issues, but the final thing regarding the deficient performance of Mr. Burns is, or trial counsel is exemplified in trial counsel's failure to file just basic motions in terms of, for example, a motion to dismiss based upon the double jeopardy clause of the constitution. The court found the government, after the verdicts were given by the jury, the defense filed a motion to merge those counts because of the obvious double jeopardy issues. Government alleged that the motion was untimely because the rules require that motion be filed prior to trial, which they were correct, but the district court found good cause and granted the motion. Are there any questions regarding the motion for new trial? I want to move on then to the sentencing issues. There are three sentencing issues or four sentencing issues. The first is the district court's analysis of the ex post facto. In this case, we had the last alleged act in regards to the naturalization fraud occurring in 2006. Mr. Ngambwa was interviewed in 2014 regarding his family relationships, regarding his alleged membership in political organizations in Rwanda. He was convicted and the district court used the, and in 2012, six years after the last act occurred regarding the naturalization offenses, the base offense level was increased by 17 levels. Well after the conclusion of the offenses for the immigration, the district court found that because Mr. Ngambwa had falsely given an interview with a federal agent in 2014, then the district court used the one book method, which was from 2014, and applied that 17 level increase in the base offense level, which of course significantly increased Mr. Ngambwa's offense level. And we would argue that based upon the Supreme Court Pugh case, P-E-U-G-H, that the district court was not correct in its ex post facto holding. Are you arguing that the one book rule is invalid or that the district court made an error in relating the false statements 1001 charge back to the original false statements, or both? Both. The grouping decision made by the district court, the court grouped all of the offenses together, and we objected to that at the time of sentencing. And in our brief, we discussed, the district court talked about victims. She found that there were the same victims, the Department of Homeland Security. But naturalization fraud is a victimless crime, so one has to look at the societal interest, or is the societal interest the same? And in this case, and we cited a case regarding immigration, the societal interests are not the same, so the grouping analysis that the district court used was not correct. And I want to reserve the remainder of my time. Thank you. Mr. Murphy? Please, the court. I'm Richard Murphy. I was the prosecutor, lead prosecutor at trial, and also, of course, on the brief. I'll address the two arguments raised by defendant's counsel. First, with regards to the ineffective assistance of counsel claim, obviously, he accurately notes there's two prongs. One is the effectiveness claim, whether or not it's constitutionally ineffective or deficient performance, and then the second is prejudice. There's neither prejudice, nor was there deficient performance here. I would note that just a couple matters, and trying to review to make sure I didn't make any mistakes in my review of his brief, but Mr. Sheets talks here today about some things that he's not ever raised before on appeal, or not raised in his brief about Mr. Burns supposedly not filing motions for new trial, or for claiming that he's not competent in some pretrial filing, or his failure to file basic motions. Those are not the issues that have been raised on this appeal, so unless the court has questions about those, I'm going to direct my attention to the issues that were raised on appeal. And on appeal, the defendant raised three issues. He said that the defendant . . . an overarching issue, essentially, that defense counsel engaged in deficient performance by not interviewing a number of witnesses, by not calling some witnesses, and in three particular areas. That led to prejudice in three particular areas. One had to do with January 1 birthdates, that these witnesses would have been called, would have supported his theory, that the defendant didn't make the statements that were attributed to him by a number of witnesses, but that interpreters have misinterpreted his statements repeatedly over the course of time, and that his children, primarily, or other family members, could have been called to establish those inaccuracies. Counsel, was the birthdate issue even raised in the motion for new trial? It was not raised. It was not an issue that was even litigated at trial. And the birthdate issue, just to be clear, understanding what it is, all the birthdates were attributed, basically, of the children as January 1st. Not uncommon. There was testimony about that. That's not uncommon because records don't exist in these countries that have been effectively war-torn or civil strife. They don't exist. But more importantly, the defendant testified. The defendant testified at trial himself that the January 1 birthdates were because he couldn't recall the dates of birth, and that's what the U.N. told him to put down. So not only was it not an issue raised at trial or in the subsequent motions, but it's really somewhat of a non-issue because the defendant explained the reason for the January 1 birthdates at trial. This was never anything the government claimed was a false statement. The second was the immigration interviews of the children. I'm sorry. The second was his marriage, that the defendant had been married to his wife. His last name is Makakabanda. There was an issue about whether or not the defendant had more than one wife. There was the defendant's attorney had actually gone to Rwanda twice. He'd conducted a fair amount of investigation. He'd hired an investigator in Rwanda. He worked with the investigator in Rwanda. This was a highly experienced defense attorney, 31 years as a lawyer, nearly 90 trials. He served nine years as an appellate defender. He's fully aware of what the standards are for effective assistance. And I would submit the record shows he fully complied with his duties. He investigated these claims about marriage, and what he found out, that the government was right. The government was alleging that the defendant had been married to another woman in Rwanda, a woman whose last name is Nira Makumbi. And he found out he'd interviewed her, found out yes, he interviewed others in Rwanda, and found out that yes, in fact, they said the defendant had been married to Nira Makumbi. And the defendant claimed, well, he'd never had been married to her. That had an impact on whether or not he'd had children with her, whether or not he had been married to two people in Rwanda, all which were important because, as the evidence showed, you can only make lawful claims for refugee status for your true biological children. He was trying to bring in kids who weren't his children. There were also issues of, there's a question on the immigration forms, whether you plan to practice polygamy in the United States, which could be a disqualifier for relief. If he's got two spouses, he's practicing polygamy. So there were a number of issues like that that defense counsel appreciated and didn't want to highlight this issue concerning Makakabanda, whether or not he was indeed married to Makakabanda. He didn't want to get into the marriage issue any more than it had been addressed at trial, and he testified to that. And aside from that, what could defendant's children testify to? At best, what they could testify to is that they believed that the defendant was married to Makakabanda. None of them had ever seen a marriage certificate. Obviously, they were not present, maybe not so obviously, but they weren't present for any marriage ceremony. So they could have offered very little on that point. The next matter is whether or not the immigration interviews of children, and there was discussion here about, you know, you should have called these children to testify at trial. Well, as the court specifically found, the court specifically rejected this claim that the defendant's counsel didn't call witnesses to testify at trial. There were witnesses that the government presented, but through an agreement with counsel that he was then able to take the witnesses on direct rather than having to recall them as his own witnesses, and he did that with four witnesses. And two of defendant's children, or three of the defendant's children, actually did testify at trial. And defendant's counsel did ask them about some of these relevant issues that counsel is now complaining about. So there is contrary evidence in the record concerning the marriage to Makakabanda, who was the mother. There's evidence that was, I would say, favorable, somewhat favorable to the defense, that came in through the witnesses who the government called. There certainly was incriminating evidence, and that's why the government called those children, if you will, as witnesses. But the government didn't find out, as the court noted, until a week before trial, that two of the witnesses who it had had in grand jury, who it had been interviewing, two of the children, two of the older children, were actually not children, not biological children of Makakabanda and defendant. They were the ones who purported to come into the country as husband and wife, bringing their children. And we didn't find out until a week before trial that those children were not children. They were actually nephews. And we had found out before that, a few months before that, or about a year before that, that one of the other children was only a child of the defendant's, but it was a child of his with Nirumakumbi, who he denied having been married to or effectively having any relationship. And then when he was interviewed again in November of 2014, he finally admitted when he had been aware that his one son had been in the grand jury and that his son had told us in 2014 that his mother was Nirumakumbi, it wasn't Makakabanda. He then finally admitted that, but he still claimed the others were his biological children. He still claimed he had not been married to Nirumakumbi. And defense counsel, through his investigation, had learned that some of those facts were not true. He had evidence. He developed witnesses, and he didn't want to put on certain witnesses at trial so that it would make us available to cross-examine them. Obviously, defense putting on witnesses to support a position that he believed and, in fact, knew to not be true might raise some ethical concerns. I'd submit that the counsel here fully carried out his duties as an effective attorney. The problem was, the real problem was here, that the defendant had lied about a lot of things. And those lies are set out in our sentencing memo at the district court docket at 19470-74 and the district court's order docket 211 at pages 11-12. But there are a number of things. He lied about having relatives in the military, which was important, because it was the military that was committing the genocide in Rwanda, and there was testimony about that. If he had relatives in the military who were committing the genocide in Rwanda, was he similarly aligned? Was he also a genocidaire? And, in fact, there was evidence in the sentencing record from Mr. Rabidadi, his brother who was in the military, who himself was convicted of genocide, and whose own statement says that he went to the defendant's house when the genocide started to protect him. Well, there was evidence and reason to believe that if you were being protected, then you were part of the party that was committing the genocide. So that's one of the lies. He denied, of course, and this goes into sentencing, but that he denied on the immigration forms that he had not been involved in killing others or persecuting others, and the court found that to not be true. And that was important because if he had admitted that, he wouldn't have been allowed to come in as a refugee. He lied about his surviving family. He claimed all his family had been killed, essentially, in the genocide. And this is, again, in advance of the refugee claim, and that was important, as the INS officer testified, because if he had other family members who were surviving in Rwanda, then that raises a question, well, how can they survive? If they are like-minded to you, if you are like-minded to them, if you have fears about your family being killed because of your status, how can they survive there? Yet you claim you can't, and the answer is because he was involved in the genocide and he was wanted, he would have been in danger had he gone back there by people who might have retaliated against him for what he did during the genocide. Again, he denied his marriage to Elvira Nyirima Kumbi. He denied being a member of MDR Power. MDR Power was the party that was in power that was anti-Tutsi, that was heavily anti-Tutsi. There was an MDR Party, but then MDR Power were the violent ones that worked with a militia group called the Interra Homwe to commit the genocide, and there was evidence that he was a member of MDR Power. What's the business about his claiming his uncle was prime minister or some high official? That was the main claim, if you will, the main falsehood. That is the primary reason that the INS officer testified that he found that the defendant had established a basis for past persecution and authorized the refugee status. Faustine Togeremungu was a member of a moderate political party, the moderate faction of MDR in Rwanda. There was something called the Arusha Accords, which had been negotiated by President Habyarimana with some of the neighboring countries, and the Arusha Accords was a power-sharing arrangement. So the Tutsi, a great minority, I mean a 5% minority in Rwanda, the Hutu being 90%, 95%, had been oppressed through the years, although they had been in power at various times, and there had been these civil war factions between the Tutsi and the Hutu. Habyarimana had negotiated the Arusha Accords, which was basically a power-sharing arrangement so that the Tutsi would be given some share in the government with the Hutu and that they would be able to try to go forward in a peaceful way. Well, the Hutu didn't want that. They didn't want anything to do with sharing with the Tutsi. So Habyarimana was out of the country. I believe he was in Tanzania in a regional meeting talking about finally going to implement the Arusha Accords, this power-sharing arrangement. And when he was returning from that in April of 1994, his plane was shot down. And it's uncertain who shot his plane down, but it's believed it could have been the Hutu extremists. In any event, once his plane is shot down, that's when the genocide started. Within the next day, the Hutu began mass slaughtering Tutsis and others that were sympathetic to the Tutsi, and the genocide started. That went on for 100 days. There was a force called the RPF, the Royal Patriotic Front, which were exiled Tutsis. And they were in neighboring countries, I believe in Congo and Burundi, Tanzania. But they invaded the country after 100 days and were able to put down this uprising of the Hutu, which the defendant was a member of and many, many witnesses said he was a leader and a killer in the genocide, and the court found that those were true. So the RPF invaded, they put down the genocide, and then some version of the Arusha Accords, not the exact precise Arusha Accords, but a power-sharing arrangement was put in place, and Faustine Tugaramungu, who had been a moderate member of the MDR power, was then put in place as the prime minister going forward post-genocide. And he stayed there for about a year, and then more disputes began to arise in the government, and he exiled to Belgium. So I'm sorry that's a long answer, but the defendant claims that he's the brother of Faustine Tugaramungu. Tugaramungu was not favorably viewed by a big part of the population because he was in favor of this power-sharing arrangement. He was somewhat sympathetic to the Tutsi. And so he eventually had to go in exile to Belgium, and the defendant says, essentially, in so many words, and I believe it's Exhibit 5, if I recall correctly, but interviewed with Joe Martin and with other people in the refugee process, interviewed several times, but he basically says, that's my brother, and he's wanted. People want to kill him there because they think he's sympathetic to the Tutsi, and if I go back, I'll be killed because I'll be aligned with him. And again, this goes to the same thing. And then he claims his whole family had been killed when, in fact, they hadn't been killed. And the immigration officer says, had we known that, had we known that this stuff wasn't true, and we couldn't investigate it. I mean, we're drinking out of a fire hose. There's hundreds of thousands, a million or more refugees. We're trying to identify the relative few that are eligible for refugee status. We have to accept what they tell us is true unless it's blatantly false on its face. Counsel, could you go ahead now and tell us your views on the ex post facto and grouping issue? Yes, Your Honor. As far as the ex post facto clause, the issue is it's the one-book rule under 1B111 that says essentially if the defendant's convicted of two offenses, one before, one after a change in the guidelines, you use the new book, 1B11.11B3. And here there was a change in the guidelines that followed the defendant's immigration offenses. His immigration offenses last date, counsel accurately notes, is 2006. 2012, the guideline changed. It called for an increase in the guideline for naturalization fraud if the offense was committed to conceal the involvement in a serious human rights offense. Do you think that United States v. Anderson from this court is still good law in light of Peel? I do, Your Honor, and we cite that case. And Anderson, we believe, is still good law. That case, and there are numerous other cases. The Qualls case, which was unpublished out of the Second Circuit, but the Pagan-Farrar case collects a bunch of cases on this issue. Shokbazian out of the Fifth Circuit, which the district court cites, and there's a Hallahan case out of the Seventh. But we do believe that's correctly decided. We believe that the counts here were properly grouped because the defendant committed the fraud or lied effectively to come into the country. That was fraud. He committed that fraud. And then when he was questioned about it in November of 2014, he changes his mind. He says, no, I never lied. I never lied, again, to continue the fraud. If he had admitted he lied, he would have admitted he committed immigration fraud and he'd be deported. But in 2014, he has to then change and say, I never lied. I never claimed Tugaramungu was my brother. I never made these other statements. So we claim that those are two offenses connected by a common scheme or plan. And the common scheme or plan here was to remain lawfully in the United States, to get status and lawfully remain in the United States. There is no victim in this case. The case of the victim in the immigration case becomes, it's basically an affront to the system. And we cite the Popao case of the Eighth Circuit. But it's DHS's ability to enforce immigration laws and investigate the immigration violations. The victim becomes the societal interest, and the societal interest is enforcing the immigration laws. So, and the defendant raises this grouping issue. I'm not even sure, though, on further review that the grouping issue matters. Because if you look at the guidelines, if you look at the background to 1B111, the background itself, post-Pew, says it doesn't even matter if the guidelines group or not. Whether they group or not, you still apply the second book, or the most recent book. And that does not violate Pew. It's never been found to violate Pew by any circuit that I'm aware of. And I think Anderson stands for that proposition. I'm sorry? I thought there was one circuit. Wasn't the seventh? It said that it was a violation. I don't believe the seventh has. I think the seventh in the Hallahan case said to the contrary. But I'm not recalling if there was. But certainly the great majority say it hasn't. Thank you. Thank you. Your Honor, the seventh circuit in McMillan, as set forth in the defendant's brief, was very critical of the one-book method post-Pew. And so that analysis is set forth at length in my main brief and the reply brief. It's United States v. McMillan. Going back to the original motion for new trial, the court had asked a question about January 1 birth dates, and the government said, well, it was the defendant explained that it was what the United Nations told him to say. And that was the defendant's testimony in one sentence at the trial. But I think that illustrates that there was a lot of ‑‑ I mean, if you can imagine, as the government states, you're in a refugee camp with a million people, and I can't imagine what the conditions were, but there was a lot of ‑‑ by everyone to process these people and get them out of these horrific conditions that they were in. And that included stating birth names that weren't correct. That included having your nephews, who you were there in the camp with, listed as children. And Mr. Ngunwa's children would have testified that they always considered them to be brothers and sisters. In fact, several of them testified at the motion for new trial that they didn't even know that they were not their biological brothers. And that was the first time that they had learned of it. Now, Mr. Murphy, or the government, states that a trial counsel was a highly experienced attorney. You just look at the document 35, his objections to the magistrate's order denying a motion to appoint counsel. And he objected. Trial counsel himself objected, quote, Mr. Ngunwa objects to the magistrate's finding that he has two highly competent and experienced federal public defenders representing him. So that comes directly from trial counsel himself. There is no doubt that trial counsel investigated the case. He went to Africa twice at the government expense. He went to several countries in Africa. He hired an investigator to go with him at $100,000 at taxpayer's expense. And yet, the children of Mr. Ngunwa, who are here today, who lived in Cedar Rapids, he didn't talk to. And they had the best evidence as to family relationships. And this is what the trial was about. It wasn't about MDF. It wasn't about this party or that party. It was about did Mr. Ngunwa commit immigration fraud when he talked about his family relationships. One point of clarification, if you can. Did these individuals who you are critical of counsel for not speaking to, did they testify before the grand jury? Two of them did. The two oldest nephews' children did testify at the grand jury. And was that testimony available to counsel? Yes. So does that somewhat diminish your argument with respect to failure to investigate or interview if he already had available their testimony? No. And the reason is that because they were never questioned about many of the things that the jury found. For example, were you ever interviewed by immigration while you were in the refugee camps? They were never asked that question in the grand jury. Yet the jury found that they were interviewed and they talked about the uncle being whoever. They testified at the hearing on the motion for a new trial that they were never interviewed, period. And so that's why Mr. Ngunwa was prejudiced by trial counsel's failure to interview them. Thank you, Your Honors. Counsel? Case is submitted. And counsel may stand aside.